**Morris M. GOLDINGS, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 10–277C.**

United States Court of Federal Claims.

May 6, 2011.

Reid Moore, Jr., Palm Beach, FL, for the plaintiff.

Carrie A. Dunsmore, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With her were Kirk T. Manhardt, Assistant Director, and Jeanne E. Davidson, Director, Commercial Litigation Branch, and Tony West, Assistant Attorney General, Civil Division. Michael Kiely, United States Postal Service, and Jennifer Olkiewicz, Federal Bureau of Investigation, of counsel.

## OPINION

HORN, J.

Before the court is the government's motion to dismiss the complaint filed by the plaintiff, Morris M. Goldings. In his complaint, Mr. Goldings alleges that the United States Postal Service breached an "implied contract for a reward" to pay him for information and services provided with respect to the government's investigation of the anthrax mailings. Plaintiff seeks $2,500,000.00 in damages. For the purposes of the motion to dismiss only, the defendant has accepted as true the facts as alleged in the complaint.

In its motion to dismiss pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant contends that the plaintiff's complaint fails to allege three necessary elements of an implied-in-fact contract with the government: 1) mutual intent to contract, 2) unambiguous offer and acceptance, and 3) that a representative with actual authority to bind the government entered into the agreement. In the alternative, if an implied-in-fact contract came into being under the facts as pled, the government argues that the terms of the contract were never fulfilled because the information and services provided must lead to arrest and conviction for a Postal Service offense, and in this case, the government's primary suspect in the investigation committed suicide before being arrested, indicted, or, much less, convicted. Consequently, the defendant argues that this court should dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted.

In plaintiff's response to defendant's motion to dismiss, plaintiff takes issue with defendant's "description of the Plaintiff's case as one alleging merely an 'implied contract.'" Plaintiff states that the law "more precisely characterizes the announcement of a reward as an offer for a 'unilateral contract,' the performance of which constitutes the acceptance of the offer." Plaintiff further contends that his performance was in "substantial compliance" with that offer, which, therefore, constituted acceptance and created a binding agreement with the government. The plaintiff acknowledges that the prime suspect of the investigation was never arrested, indicted or convicted for the criminal activity at issue, but argues that plaintiff's performance still qualifies for a reward, because of the suicide of the prime suspect after he was aware of an impending indictment.

## FINDINGS OF FACT

According to plaintiff's complaint, and a Postal Service announcement, a version of which plaintiff enclosed as an exhibit to his complaint, on October 18, 2001, the United States Postal Inspection Service (USPIS) and the Federal Bureau of Investigation (FBI) jointly announced that "an award of up to $1 million is being offered for information leading to the arrest and conviction of those responsible for mailing letters containing anthrax such as those sent to Tom Brokaw at NBC [National Broadcasting Company] and to U.S. Senator Tom Daschle." The USPIS and the FBI subsequently issued undated announcements raising the amount of the special reward up to $1,250,000.00, and then up to $2,500,000.00. The various announcements all referred to more detailed reward

"posters" or "notices." For example, two of the announcements attached to plaintiff's complaint contained the following statement: "Reward payment will be made in accordance with the conditions of Postal Service Reward Notice 296, dated February 2000." Plaintiff's complaint states that the government, however, was "unwilling or unable to provide a copy of the February 2000 Postal Service Reward Notice 296." Plaintiff, therefore, attached to his complaint a copy of a June 2006 Poster 296, Notice of Reward, which he had obtained online.[1]

Nor did the defendant, without prompting by the court, supply a copy of the missing February 2000 Postal Service Reward Notice 296, which was referred to in the USPIS announcements attached to the plaintiff's complaint. Instead, defendant's posture was to accept as true the factual allegations in the plaintiff's complaint. Defendant also indicated that, based on information and belief, the February 2000 Poster 296 and the June 2006 Poster 296, at General Provision 1, were the same. However, not only are the two versions (February 2000 and June 2006) of General Provision 1 not the same, but a third version of Poster 296 published in the Postal Service's Code of Federal Regulations (CFRs) (July 1, 1999 to July 1, 2010) differs from the other two versions.

The court identified a copy of Poster 296 published as a Note in the Postal Service's CFRs, 39 C.F.R. § 233.2(b) Note (July 1, 1999 to July 1, 2010). The same General Provision 1 of Poster 296 has been published in the Postal Service CFRs for at least the last ten years, from July 1, 1999, through July 1, 2010. The version of Poster 296, General Provision 1 in the CFRs differs from the June 2006 version of Poster 296, General Provision 1, which was obtained online and included in the plaintiff's complaint (and differs, as well, from the February 2000 version of Poster 296, General Provision 1, cited by the USPIS and FBI announcements attached to the plaintiff's complaint). When the court raised the discrepancies with the parties, the defendant provided the court with a copy of the February 2000 Poster 296, as well as a January 2002 Poster 296 and a June 2004 Poster 296.

Neither party brought to the court's attention the discrepancies in the language of the various versions of Poster 296, General Provision 1. The "missing" February 2000 Poster 296 and the January 2002 Poster 296, General Provision 1, both state, in part: "The Postal Inspection Service investigates the above describes [sic] crimes. Information concerning the violations, requests for applications for rewards, and written claims for rewards should be furnished to the nearest Postal Inspector." The January 2004 Poster 296 and the June 2006 Poster 296 both added the following language to the two, above-quoted, earlier versions (February 2000 and January 2002) of Poster 296, General Provision 1: "The written claim for reward payment must be submitted within 6 months from the date of conviction of the offender, the date of formally deferred prosecution, or the date of the offender's death, if the offender was killed while committing a crime or resisting lawful arrest for one of the above [postal] offenses." The Poster 296 version contained in the CFRs, General Provision 1, states: "The written claim for reward payment must be submitted within six months from the date of conviction of the offender, or the date of formally deferred prosecution or the date of the offender's death, if killed in committing a crime or resisting lawful arrest for one of the above [postal] offenses."[2] 39

---

**1.** Plaintiff advised the court that he obtained the June 2006 version of Poster 296, a copy of which is found at exhibit D of the complaint, through the internet, by accessing the website for the USPIS, on or about August 1, 2008. The court recently explored the same United States Postal Inspection Service website, and found the same June 2006 Poster 296 through accessing "Press Room," "Publications," "Posters" and finally, "Poster 296" on the USPIS website.

**2.** The offenses listed on the February 2000 Poster 296 are as follows: murder or manslaughter of postal employee; assault on postal employees; mailing bombs or explosives; postage or meter tampering; robbery of mail; burglary of post office; money laundering through the mail; offenses involving postal money orders; theft, possession, destruction, or obstruction of mail; mailing child pornography; mailing poisons, controlled dangerous substances, hazardous materials, illegal drugs, or cash proceeds from illegal drugs; and for being an accessory to the above crimes, for receiving mail, money or property from the above crimes, and for conspiracy to

474

C.F.R. § 233.2(b) Note (July 1, 1999 to July 1, 2010).[3]

The Program Manager for the Postal Inspection Service, Evelena C. Carroll, in a sworn declaration dated January 11, 2011, offered clarification on the origin of the discrepancies between the language contained in the Poster 296 in the Postal Service CFRs, and the other individual Posters 296. Ms. Carroll advised that she generally used the Poster 296 version in the CFRs as the basis for the individual Notice of Reward Posters, but for clarification altered the language slightly from the version in 39 C.F.R. § 233.2 when copying General Provision 1.

In October and November 2001, plaintiff sent seven emails to a website established by the USPIS and the FBI for the receipt of information that might assist the government in locating the mailer of the anthrax-laden letters. Among other issues, the plaintiffs seven emails discussed the envelopes used in the anthrax mailings and how investigators might find their point of sale. According to the complaint, on October 30, 2001 and on "several other days" in November, 2001, the FBI sent form replies to the plaintiff, which acknowledged receipt of the plaintiffs information and provided that plaintiffs submissions would "be evaluated and given appropriate consideration." On January 26, 2002, plaintiff called the Joint FBI–USPIS Anthrax Investigation Office in Newark, New Jersey and spoke to Postal Inspector Stephen C. Panzera. Inspector Panzera informed the plaintiff that he was not aware of plaintiff's seven emails, and requested that the plaintiff fax him copies of the emails. On January 28, 2002, the plaintiff faxed copies of the seven emails to Inspector Panzera as requested. On February 11, 2002, plaintiff faxed Inspector Panzera the copies a second time, pursuant to a phone conversation with Inspector Panzera in which plaintiff learned that he had sent the emails to the wrong fax number. On February 14, 2002, after another telephone conversation with Inspector Panzera, plaintiff faxed him five pages of information about the envelope manufacturer and the Federal Eagle printed stamp used in the anthrax mailings.

The plaintiff continued to submit information to Inspector Panzera and to the FBI in 2002, 2003, and 2005. According to the complaint, plaintiff alleges that from October 2001 to January 2005, the USPIS and the FBI assigned investigative and forensic resources and followed "many of the investigative leads" provided by the plaintiff. Plaintiff states that as early as January 2002, the USPIS opened a file with the title "Morris Goldings," the contents of which were described by the USPIS as "leads concerning the mailing envelopes." According to the complaint, the Amerithrax Investigative Summary, which was released to the public by the United States Department of Justice on February 19, 2010, as well as other released materials, constitute the basis for plaintiff's belief that the government's investigation of the manufacture and sale of the envelopes relied, at least in part, on the leads provided by plaintiff. According to the complaint and the Amerithrax Investigative Summary, after seven years, the government investigation into the October 2001 anthrax mailings resulted in the identification of a suspect, a microbiologist named Dr. Bruce Ivins. Also according to the complaint, which referenced the Amerithrax Investigative Summary, by the summer of 2008, the

commit any of the above crimes. The same offenses were listed on the Poster 296 in the Postal Service CFRs from July 1, 1999 through July 1, 2003. *See* 39 C.F.R. § 233.2(b) Note (July 1, 1999 to July 1, 2003). In the Poster 296 in the July 1, 2004 CFRs, there were some adjustments and additions in the offenses. *See* 39 C.F.R. § 233.2(b) Note (July 1, 2004). For example, the mailing of poison and hazardous materials was broken out into a new category, "Offenses Involving the Mailing of Threatening Communications, Weapons of Mass Destruction, Poisons, or Hazardous Materials," with a reward up to $100,000.00. Although the July 1, 2004 CFR also added some language to the General Provisions, General Provision 1 remained the same each year from July 1, 1999 through July 1, 2010.

**3.** Poster 296, General Provision 2, continues: "The amount of any reward will be based on the significance of services rendered, character of the offender, risks and hazards involved, time spent, and expenses incurred. Amounts of rewards shown above are the maximum amounts which will be paid." 39 C.F.R. § 233.2(b) Note (July 1, 1999 to July 1,2010).

United States Attorney's Office for the District of Columbia was "preparing to seek authorization" to ask a federal grand jury to return an indictment charging Dr. Ivins with Use of a Weapon of Mass Destruction, in violation of 18 U.S.C. § 2332(a) (2006), and related charges. Plaintiff further alleges in his complaint that the indictment being prepared "was to be based to a substantial extent" on the evidence and leads he had provided and summarized in his complaint. An indictment, however, never was issued.

According to the Department of Justice's February 19, 2010, Amerithrax Investigative Summary:

In the fall of 2001, the anthrax letter attacks killed five people and sickened 17 others. Upon the death of the first victim of that attack, agents from the Federal Bureau of Investigation ("FBI") and the United States Postal Inspection Service ("USPIS") immediately formed a Task Force and spent seven years investigating the crime.

The Amerithrax investigation is described below. In its early stages, despite the enormous amount of evidence gathered through traditional law enforcement techniques, limitations of scientific methods prevented law enforcement from determining who was responsible for the attacks. Eventually, traditional law enforcement techniques were combined with groundbreaking scientific analysis that was developed specifically for the case to trace the anthrax used in the attacks to a particular flask of material. By 2007, investigators conclusively determined that a single spore-batch created and maintained by Dr. Bruce E. Ivins at the United States Army Medical Research Institute of Infectious Diseases ("USAMRIID") was the parent material for the letter spores. An intensive investigation of individuals with access to that material ensued. Evidence developed from that investigation established that Dr. Ivins, alone, mailed the anthrax letters.

By the summer of 2008, the United States Attorney's Office for the District of Columbia was preparing to seek authorization to ask a federal grand jury to return an indictment charging Dr. Ivins with Use of a Weapon of Mass Destruction, in violation of Title 18, United States Code, Section 2332a, and related charges. However, before that process was completed, he committed suicide. Aware of the FBI investigation and the prospect of being indicted, Dr. Ivins took an overdose of over-the-counter medications on or about July 26, 2008, and died on July 29, 2008. Administrative and investigative steps taken in the past year toward closure of the investigation confirm the conclusion that Dr. Ivins perpetrated the anthrax letter attacks.

Believing that his information "greatly assisted" in the identification of Dr. Ivins, plaintiff submitted a claim to the USPIS on August 20, 2008. The claim requested "at least a portion" of the special reward offered by the USPIS and the FBI for plaintiff's assistance in the anthrax investigation. Plaintiff's claim was accompanied by a set of "Documents in Support of Claim for Reward for Information Relating to the Anthrax Mailings in 2001," which included, among other items, copies of the emails that plaintiff had sent to the USPIS and FBI website and copies of plaintiff's correspondence with USPIS Inspector Panzera. Plaintiff supplemented his claim for a reward by letter to the USPIS dated December 8, 2008, to which he attached a copy of a letter he had sent to the FBI on December 3, 2008 that referred to plaintiff's assistance in the anthrax mailing investigation.

On March 16, 2009, the Inspector in Charge of the Criminal Investigation Group of the USPIS, Inspector Daniel Cortez, sent a letter to the plaintiff in which he stated that, as the Chief Postal Inspector's Designee in regard to administering payments for rewards offered by the USPIS, he was denying the plaintiff's request for a reward payment for the following reasons:

The Special Reward offering in this matter was made jointly by the Inspection Service and the FBI pursuant to the Inspection Service's authority under Federal statute and regulation, specifically, 39 U.S.C. § 404(a)(7) [2006 U.S.C] and 39 C.F.R. § 233.2.

Rewards may be paid by the Postal Service in accordance with the conditions stated in the applicable Poster 296, Notice of Reward. Pursuant to Federal regulation, the amount of any reward paid is based in part on the significance of services rendered. However, as clearly noted in the Poster 296, rewards are offered for information and services leading to "the arrest and conviction" of any person for the specified offense.

To date, there have not been any arrests made, nor any convictions in the above-referenced investigation. Since this requirement has not been met, your request for a reward payment is hereby denied. It is therefore not necessary to comment further on the substance of the information you have submitted in support of your claim. (footnotes omitted).

The plaintiff responded by letter, dated March 24, 2009, in which he requested that Inspector Cortez reconsider his denial of the reward payment. In support of plaintiff's request for reconsideration, plaintiff referred to Postal Service Poster 296, General Provision 1. In particular, plaintiff emphasized the language in General Provision 1 that a claim for reward payment is properly submitted, even in the absence of an arrest and conviction, if such a claim is furnished "within six months from ... the date of the offender's death, if killed in committing a crime or resisting lawful arrest for one of the above [postal] offenses." See General Provision 1, 39 C.F.R. § 233.2(b) Note (July 1, 2001), a provision with which plaintiff alleges he complied. The plaintiff offered his interpretation that Dr. Ivins' suicide satisfied the above-quoted clause:

The several public statements of the Federal Bureau of Investigation made since his [Dr. Ivins'] death include facts from which it must be concluded that Dr. Ivins was killed by his own hand under circumstances tantamount to resisting lawful arrest for the crime at least of "mailing poison." A fair and reasonable interpretation of General Provision 1 is that the Postal Inspection Service anticipated circumstances in which a reward would be made notwithstanding the absence of an

"arrest" and "conviction." If ever such a circumstance existed the present case is one. Incidentally, in such an application of the "arrest and conviction" requirement the Service would be consistent with the great weight of authority of courts which have interpreted that phrase under cases involving the law of reward.

I request that you reconsider the denial of my request for reward in the light of the above presentation.

On June 30, 2009, Inspector Cortez replied by letter and stated that, "[f]irst, we do not agree with nor find any foundation to support your conclusion that the death of Dr. Ivins in this matter is in any manner tantamount to resisting arrest...." Inspector Cortez's letter further stated that, "[a]t the time of his [Dr. Ivins'] death, the Amerithrax investigation was focused on Dr. Ivins, but it is inaccurate to assume his arrest was imminent." The letter concluded that "the basis for denying your initial claim remains valid.... [Y]our claim for a reward payment is denied.... There are no further appeals or administrative remedies within the Postal Inspection Service."

As noted above, on February 19, 2010, the FBI released its Amerithrax Investigative Summary, which plaintiff alleges "cast great doubt" on the accuracy of Inspector Cortez's assertions, in that the Amerithrax Investigative Summary confirmed the "imminence of the indictment of Dr. Ivins" before his death. On March 1, 2010, the plaintiff sent a letter to Robert S. Mueller, Director of the FBI, to which plaintiff appended a "Comparison of the Amerithrax Investigative Summary and the Submissions of Morris M. Goldings." In light of the information disclosed by the Amerithrax Investigative Summary, plaintiff's letter requested that Director Mueller reverse Inspector Cortez's March 16 and June 30, 2009 denials of the plaintiffs claim for a reward. According to the complaint, no response to plaintiff's March 1, 2010 letter had been received as of the date the complaint was filed in the present case.

On May 7, 2010, the plaintiff filed a complaint in this court alleging that the USPIS's refusal to grant him a portion of the reward offered for information concerning the an-

thrax mailings constitutes "breach of an implied contract for a reward of up to $2.5 million." The plaintiff further contends that he has satisfied the requirements of the Postal Service's Poster 296, General Provision 1 with respect to the death of the offender, because: 1) Dr. Ivins was "killed while committing a crime," (using the language of the June 2006 Poster 296), that is, Dr. Ivins killed himself by the "crime of suicide," and 2) the public interest in honoring the offer of a reward "requires the Defendant to authorize its payment under the facts set forth in this Complaint." Finally, plaintiff alleges that the services plaintiff rendered to the USPIS and the FBI constitute ample basis for the determination of the amount of the reward pursuant to Poster 296, General Provision 2 and Postal Service regulation 39 C.F.R. § 233.2(b) (July 1, 2001) (*Rewards*). The plaintiff's complaint states that:

> The services rendered by the Plaintiff to the Defendant and the FBI have been significant as they have greatly assisted them to reach the conclusion that Dr. Bruce Ivins mailed the anthrax-laden envelopes. The time spent by the Plaintiff in rendering these services has been significant over a period of more than nine years. The expenses involved and incurred by the plaintiff have been substantial and have included the retaining of the services of attorneys to communicate with the Defendant and the FBI and to present this claim.

In his complaint, the plaintiff seeks judgment in the amount of $2,500,000.00.

## DISCUSSION

In examining what must be pled in order to state a claim, under both Rule 8(a)(2) of the Rules of the United States Court of Federal Claims and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); Fed.R.Civ.P. 8(a)(2) (2011). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The United States Supreme Court, in the *Twombly* case, stated that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Papasan v. Allain*, 478 U.S. 265, 286 [106 S.Ct. 2932, 92 L.Ed.2d 209] (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n. 1 [122 S.Ct. 992, 152 L.Ed.2d 1] (2002) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236 [94 S.Ct. 1683, 40 L.Ed.2d 90] (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

> . . .

> [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

*Bell Atl. Corp. v. Twombly*, 550 U.S. at 555–56, 570, 127 S.Ct. 1955 (footnote and other citations omitted; brackets and omissions in original); *see also Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555–57, 570, 127 S.Ct. 1955); *Totes–Isotoner Corp. v. United States*, 594 F.3d 1346, 1354–55 (Fed.Cir.), *cert. denied*, —— U.S. ——, 131 S.Ct. 92, 178 L.Ed.2d 28 (2010); *Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed.Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a

showing of entitlement to relief." (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. at 557, 127 S.Ct. 1955)), *reh'g and reh'g en banc denied* (Fed.Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 3468, 177 L.Ed.2d 1056 (2010); *Cambridge v. United States,* 558 F.3d 1331, 1335 (Fed.Cir.2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. at 570, 127 S.Ct. 1955)); *Cary v. United States,* 552 F.3d 1373, 1376 (Fed.Cir.2009) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. at 555, 570, 127 S.Ct. 1955)), *reh'g denied* (Fed.Cir.), *cert. denied,* —— U.S. ——, 129 S.Ct. 2878, 174 L.Ed.2d 580 (2009); *Peninsula Grp. Capital Corp. v. United States,* 93 Fed.Cl. 720, 726–27 (2010); *Legal Aid Soc'y of New York v. United States,* 92 Fed.Cl. 285, 292, 298, 298 n. 14 (2010); *Maryland Enter., L.L.C. v. United States,* 91 Fed.Cl. 511, 529, *recons. denied,* 93 Fed.Cl. 658 (2010); *Dobyns v. United States,* 91 Fed.Cl. 412, 422–28 (2010).

 When deciding on a motion to dismiss based on failure to state a claim upon which relief can be granted, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Cambridge v. United States,* 558 F.3d at 1335 (citing *Papasan v. Allain,* 478 U.S. at 283, 106 S.Ct. 2932); *Cary v. United States,* 552 F.3d at 1376 (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir. 1991)); *Anaheim Gardens v. United States,* 444 F.3d 1309, 1315 (Fed.Cir.), *reh'g denied* (Fed.Cir.2006); *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir. 1998); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995). If a defendant or the court challenges jurisdiction or a plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, compe-

tent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *see also Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir.1988). "A motion to dismiss under Rule [12(b)(6) ] for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy." *Perez v. United States,* 156 F.3d at 1370. As noted above, for purposes of this motion only, defendant has accepted as true the factual allegations set forth in plaintiff's complaint.

*Plaintiff's Implied–in–Fact Contract Theory*

 In his complaint, plaintiff alleges that based on the facts alleged, defendant breached an implied-in-fact contract to pay him for information he supplied to a government investigation. Plaintiff also argues in response to defendant's motion to dismiss that the government breached a "unilateral contract," and that plaintiff's performance resulted in acceptance of the government's unilateral offer. An implied-in-fact contract is an agreement " ' "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." ' " *Trauma Serv. Grp. v. United States,* 104 F.3d 1321, 1326 (Fed. Cir.1997) (quoting *Hercules, Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio Ry. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923))); *see also Hercules, Inc. v. United States,* 516 U.S. at 423–24, 116 S.Ct. 981; *Bank of Guam v. United States,* 578 F.3d at 1329 (citing *Trauma Serv. Grp. v. United States,* 104 F.3d at 1326); *Bay View, Inc. v. United States,* 278 F.3d 1259, 1265–66 (Fed.Cir.2001) (quoting *Trauma Serv. Grp. v. United States,* 104 F.3d at 1326), *reh'g and reh'g en banc denied,* 285 F.3d 1035 (Fed.Cir.), *cert. denied,* 537 U.S. 826, 123 S.Ct. 114, 154 L.Ed.2d 37 (2002); *Peninsula Grp. Capital Corp. v. United States,* 93 Fed.Cl. at 728 (citing *Baltimore & Ohio Ry. Co. v. United States,* 261 U.S. at 597, 43 S.Ct. 425 and *Russell Corp. v.*

United States, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977)). Such an agreement will not be implied "unless the meeting of minds was indicated by some intelligible conduct, act or sign." *Baltimore & Ohio Ry. Co. v. United States*, 261 U.S. at 598, 43 S.Ct. 425; *see also Russell Corp. v. United States*, 210 Ct.Cl. at 609, 537 F.2d at 482.

 "Plaintiff has the burden to prove the existence of an implied-in-fact contract." *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed.Cir.2003). " 'A well pleaded allegation of an express, or implied-in-fact, contract necessarily includes allegations going to each of the requisite elements of a contract.' " *De Archibold v. United States*, 57 Fed.Cl. 29, 32 (2003) (quoting *McAfee v. United States*, 46 Fed.Cl. 428, 432, *appeal dismissed*, 243 F.3d 565 (Fed.Cir.2000)). "A party alleging either an express or implied-in-fact contract with the government 'must show a mutual intent to contract including an offer, an acceptance, and consideration.' " *Bank of Guam v. United States*, 578 F.3d at 1326 (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d at 1325); *see also Chattler v. United States*, 632 F.3d 1324, 1330 (Fed.Cir.) (citing *Trauma Serv. Grp. v. United States*, 104 F.3d at 1325), *reh'g en banc denied* (Fed.Cir.2011); *Hanlin v. United States*, 316 F.3d at 1328 (citing *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998)); *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed.Cir.) ("The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract.") (citations omitted), *reh'g denied and en banc suggestion declined* (Fed.Cir.), *cert. denied*, 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997); *Toon v. United States*, 96 Fed.Cl. 288, 299–300 & 299 n. 12 (2010); *Peninsula Grp. Capital Corp. v. United States*, 93 Fed. Cl. at 728 (citing *Total Med. Mgmt., Inc. v. United States*, 104 F.3d at 1319). The elements of a binding contract with the United States are identical for express and implied-in-fact contracts. *See De Archibold v. Unit-*

ed *States*, 57 Fed.Cl. at 32 (citing *Trauma Serv. Grp. v. United States*, 104 F.3d at 1325); *see also Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1265 (Fed.Cir.2005) (citing *Schism v. United States*, 316 F.3d 1259, 1278 (Fed.Cir.2002) (*en banc* ), *cert. denied*, 539 U.S. 910, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003)); *Mastrolia v. United States*, 91 Fed.Cl. 369, 384 (2010) (citing *Flexfab, L.L.C. v. United States*, 424 F.3d at 1265). The government "is not bound by its agents acting beyond their authority and contrary to regulation." *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1153 (Fed. Cir.1983) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)) (other citations omitted); *see also Chattler v. United States*, 632 F.3d at 1330; *Toon v. United States*, 96 Fed.Cl. at 299–300; *Gonzalez–McCaulley Inv. Grp., Inc. v. United States*, 93 Fed.Cl. 710, 714 (2010).

In its motion to dismiss, the defendant argues that plaintiff's complaint fails to state a claim upon which relief can be granted because the complaint does not sufficiently allege the elements of an implied-in-fact contract with the United States: mutual intent to contract, unambiguous offer and acceptance, and an allegation that a representative of the government with actual authority to bind the government entered into the agreement with the plaintiff. *See Trauma Service Grp. v. United States*, 104 F.3d at 1325. Defendant also asserts that the complaint's factual allegations illustrate that the alleged contract terms were never fulfilled because Dr. Ivins' suicide does not satisfy the express terms of Postal Service Reward Poster 296.

Defendant argues that plaintiff's complaint is not explicit as to what act or document created the alleged contractual relationship between the plaintiff and the government. Defendant acknowledges, however, and the court agrees that, based on a liberal reading of the complaint in the context of supplemental filings received in the case, it can be inferred that the plaintiff relies on Postal Service Poster 296, Notice of Reward, as authorized by statute, 39 U.S.C. § 404(a)(8) (2000), and Postal Service implementing regulations, 39 C.F.R. § 233.2(b) (July 1, 2001). Section 404(a)(8) of Title 39 provides that the

Postal Service shall have the power "to offer and pay rewards for information and services in connection with violation of the postal laws...." Section 233.2(b)(1) of the Postal Service's regulations in the CFR provides that "[r]ewards will be paid up to the amounts and under the conditions stated in Poster 296, *Notice of Reward*, for the arrest and conviction of persons for the following postal offenses...." The postal offenses include "[m]ailing bombs, explosives, poison or controlled substances." 39 C.F.R. § 233.2(b)(1)(ii) (July 1, 2001). Postal Service Poster 296, included verbatim in the July 1, 2001 Postal Service regulations as a Note, offers a reward of up to $50,000.00 for information leading to the arrest and conviction of persons for the postal offense of mailing, or causing to be mailed, "Poison, Controlled Dangerous Substances, Hazardous Materials, Illegal Drugs, or Cash Proceeds from Illegal Drugs...."[4] 39 C.F.R. § 233.2(b) Note (July 1, 2001). Additional reward amounts can be offered as special rewards upon the approval of the Chief Postal Inspector. *See* 39 C.F.R. § 233.2(b) Note, General Provision 5 (July 1, 2001).

The version of Reward Poster 296, published as a Note in the July 1, 2001 Postal Service's CFR, and operative when the USPIS and the FBI issued their October 2001 announcements of a reward for information leading to the arrest and conviction in the anthrax mailings, was:

The United States Postal Service offers a reward of up to the amounts shown for information and services leading to the arrest and conviction of any person for the following offenses:

Murder or Manslaughter, $100,000. The unlawful killing of any officer or employee of the Postal Service while engaged in or on account of the performance of their official duties.

Assault on Postal Employees, $50,000. Forcibly assaulting any officer or employee of the Postal Service while engaged in or on account of the performance of their official duties.

Bombs or Explosives, $100,000. Mailing or causing to be mailed any bombs or explosives which may kill or harm another, or injure the mails or other property, or the placing of any bomb or explosive in a postal facility, vehicle, depository or receptacle established, approved or designated by the Postmaster General for the receipt of mail.

Postage or Meter Tampering, $50,000. The unlawful use, reuse, or forgery of postage stamps, postage meter stamps, permit imprints or other postage; or the use, sale or possession with intent to use or sell, any used, forged or counterfeited postage stamps or other postage.

Robbery, $50,000. Robbery or attempted robbery of any custodian of any mail, or money or other property of the United States under the control and jurisdiction of the United States Postal Service.

Burglary of Post Office, $10,000. Breaking into, or attempting to break into, a post office, station, branch, building used wholly or partly as a post office, or any building or area in a building where the business of the Postal Service is conducted, with intent to commit a larceny or other depredation therein.

Money Laundering, $10,000. Mailing or causing to be mailed any money which has been illegally obtained.

Offenses Involving Postal Money Orders, $10,000. Theft or possession of stolen money orders or any Postal Service equipment used to imprint money orders; or altering, counterfeiting, forging, unlawful uttering, or passing of postal money orders.

Theft, Possession, Destruction, or Obstruction of Mail, $10,000. Theft or attempted theft of any mail, or the contents thereof, or the theft of money or any other property of the United States under the custody and control of the United States

---

4. The current Postal Service Poster 296, contained in 39 C.F.R. § 233.2(b)(1) (July 1, 2010) raises the potential award to $100,000.00 for information leading to the arrest and conviction of persons for the offenses involving the mailing of threatening communications, weapons of mass destruction, poisons or hazardous materials. In the 2010 version, offenses related to illegal drugs and controlled substances are in their own separate category.

Postal Service from any custodian, postal vehicle, railroad depot, airport, or other transfer point, post office or station or receptacle or depository established, approved, or designated by the Postmaster General for the receipt of mail; or destroying, obstructing, or retarding the passage of mail, or any carrier or conveyance carrying the mail.

Child Pornography, $50,000. The mailing or receiving through the mail of any visual depiction involving the use of a minor engaging in sexually explicit conduct.

Poison, Controlled Dangerous Substances, Hazardous Materials, Illegal Drugs, or Cash Proceeds from Illegal Drugs, $50,000. Mailing or causing to be mailed any poison, controlled substances, hazardous materials, illegal drugs, or the proceeds from the sale of illegal drugs.

### RELATED OFFENSES

The United States Postal Service also offers rewards as stated above for information and services leading to the arrest and conviction of any person: 1) For being an accessory to any of the above crimes; 2) for receiving or having unlawful possession of any mail, money or property secured through the above crimes; and 3) for conspiracy to commit any of the above crimes.

### GENERAL PROVISIONS

1. The Postal Inspection Service investigates the above described crimes. Information concerning the violations, requests for applications for rewards, and written claims for rewards should be furnished to the nearest Postal Inspector. The written claim for reward payment must be submitted within six months from the date of conviction of the offender, or the date of formally deferred prosecution or the date of the offender's death, if killed in committing a crime or resisting lawful arrest for one of the above offenses.

2. The amount of any reward will be based on the significance of services rendered, character of the offender, risks and hazards involved, time spent, and expenses incurred. Amounts of rewards shown above are the maximum amounts which will be paid.

3. The term "custodian" as used herein includes any person having lawful charge, control, or custody of any mail matter, or any money or other property of the United States under the control and jurisdiction of the United States Postal Service.

4. The Postal Service reserves the right to reject a claim for reward where there has been collusion, criminal involvement, or improper methods have been used to effect an arrest or to secure a conviction. It has the right to allow only one reward when several persons were convicted of the same offense, or one person was convicted of several of the above offenses.

5. Other rewards not specifically referred to in this notice may be offered upon the approval of the Chief Postal Inspection [sic] (39 U.S.C. 404(a)(8)).

39 C.F.R. § 233.2(b) Note (July 1, 2001).

Neither the court nor the parties have identified any binding precedent in this Circuit which addresses directly the contractual nature of Reward Poster 296. To resolve the USPIS and FBI reward claim in the case before this court, the defendant analogizes decisions issued between 1988 and 2009, interpreting an Internal Revenue Service (IRS) reward program described in IRS Publication 733, titled "Rewards for Information Provided by Individuals to the Internal Revenue Service."[5] Defendant argues that the

**5.** The court notes that the defendant did not include a copy of IRS Publication 733 for any of the years relevant to the cases cited in support of its argument that the IRS reward cases are analogous to the present case. Defendant also did not indicate whether the applicable version of IRS Publication 733 was the same or significantly different in the cited case decisions between 1988 and 2009. The plaintiff, however, while trying to distinguish IRS Publication 733, attached a copy of the October 2004 version, which was the last revision of IRS Publication 733. The October 2004 Publication 733 provides that:

The Area Director will determine whether we will pay a reward and its amount. In making this decision, we will evaluate the information you gave in relation to the facts we developed by the resulting investigation. We will pay claims for reward in proportion to the value of the information you furnished voluntarily and

IRS publication contains "very similar" language to Postal Service Poster 296. Defendant, however, does not specify the version of either IRS Publication 733 or Poster 296 on which it relies as part of this argument.

The IRS reward cases relied on by defendant include decisions by the United States Court of Appeals for the Federal Circuit, notably *Krug v. United States*, 168 F.3d 1307, 1308 (Fed.Cir.1999) and *Merrick v. United States*, 846 F.2d 725, 726 (Fed.Cir.1988), both cited in *Cambridge v. United States*, 558 F.3d at 1335–36. These cases held that the United States cannot be contractually bound if a plaintiff invokes only the IRS reward statute and implementing publication. The Federal Circuit stated in these cases that in order to survive a motion to dismiss for failure to state a claim upon which relief can be granted, there must be an allegation in a plaintiff's complaint that the IRS has fixed the amount for the reward, or has agreed to pay a specific sum as the reward. Pursuant to these IRS based reward decisions, defendant argues that in order to survive a motion to dismiss for failure to state a claim upon which relief can be granted, plaintiff Goldings must plead that he "engaged in some dialogue" with the government about the reward amount in order to show mutual intent to contract and unambiguous offer and acceptance, all of which are necessary elements of a valid contract claim against the government. In addition, according to the defendant, plaintiff must allege that the government officer whose conduct plaintiff relied upon had "actual authority" to bind the government by contract. Defendant cites as authority *Prudential Insurance Company of America v. United States*, 801 F.2d 1295, 1297 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987) and *Essen Mall Properties v. United States*, 21 Cl.Ct. 430, 443 (1990). The defendant, therefore, argues that because plaintiff's complaint does not meet those criteria, plaintiff's complaint should be dismissed for failure to state a claim upon which relief can be granted.

In *Krug*, the March 1977 version of IRS Publication 733 (Rev. 3–77) was at issue. IRS Publication 733 stated: "The District Director will determine whether a reward will be paid, and its amount. In making this decision, the information you provided will be evaluated in relation to the facts developed by the resulting investigation." *Krug v. United States*, 168 F.3d at 1308–09. In this respect the language is similar to the language in Poster 296, at issue in the present case, which states: "The amount of any reward will be based on the significance of services rendered, character of the offender, risks and hazards involved, time spent, and expenses incurred." 39 C.F.R. § 233.2(b) Note, General Provision 2 (July 1, 2001). The United States Court of Appeals for the Federal Circuit in *Krug* described IRS Publication 733 as: "float[ing] an indefinite reward offer that an informant may respond to by conduct, but a binding contract does not arise until the Government brings the offer to ground by a specific award." *Krug v. United States*, 168 F.3d at 1309. The Federal Circuit in *Krug* also stated: "In the more usual language of contract, it can be said that, in Publication 733 and pursuant to [26 U.S.C.] § 7623 and the regulation, the Government *invites* offers for a reward; the informant *makes* an offer by his conduct; and the Government *accepts* the offer by agreeing to pay a specific sum." *Krug v. United States*, 168 F.3d at 1309 (emphasis in original). The Court of Federal Claims and the Court of Appeals for the Federal Circuit in *Krug* both addressed, and rejected, the informant's assertion of an implied-in-fact contract. *See Krug v. United States*, 41 Fed.Cl. 96, 98 (1998); *Krug v. United States*, 168 F.3d at 1308, 1310 (affirming the trial court on the issue). Similarly, in *Colman v. United States*, 96 Fed.Cl. 633, 638–39 (2011), the court found that 26 U.S.C. § 7623, as it existed in 2003, the year Mr. Colman provided information to the IRS, granted broad discretion to the Secretary of the Treasury to grant rewards to informants and was not a money-mandating statute. The court granted the government's motion to dismiss for

on your own initiative with respect to taxes, fines, and penalties (but not interest) we collect.

IRS Publication 733 (Rev. 10–2004).

want of subject matter jurisdiction in *Colman*. *Colman v. United States*, 96 Fed.Cl. at 640.

■ In *Cambridge*, the United States Court of Appeals for the Federal Circuit noted that the *Cambridge* case closely paralleled the situation in *Krug*, and distinguished the *Merrick* case, cited above. Ms. Cambridge alleged in her complaint that the IRS had recovered additional taxes based on information she had provided. *See Cambridge v. United States*, 558 F.3d at 1335. The Federal Circuit noted that such pleading was insufficient to survive a motion to dismiss for failure to state a claim upon which relief can be granted, "because even if correct, the allegation does not suggest the IRS agreed to a fixed additional award." *Id.* In contrast, the Federal Circuit in *Cambridge* noted that Mr. Merrick had communicated with the IRS and was informed by the IRS that he would receive a reward, and that the amount of the reward would be based on Publication 733. *Cambridge v. United States*, 558 F.3d at 1336. Mr. Merrick subsequently did receive an award from the IRS, but in an amount which he alleged was less than he was entitled to under Publication 733. *See Cambridge v. United States*, 558 F.3d at 1336. "Based on the IRS representations and the subsequent partial award to Mr. Merrick, we [the Federal Circuit] held Mr. Merrick alleged 'facts sufficient to state that the IRS fixed the amount of the award.' *Merrick v. United States*, 846 F.2d at 726. As seen, Ms. Cambridge points to no such agreement with the IRS." *Cambridge v. United States*, 558 F.3d at 1336. The Federal Circuit in *Cambridge* concluded its analysis of all three IRS reward cases:

> Significantly, in *Krug*, we stated that Publication 733 does not in itself create a contract. Rather, "in Publication 733 … the Government *invites* offers for a reward; the informant *makes* an offer by his conduct; and the Government *accepts* the offer by agreeing to pay a specific sum." *Krug*, 168 F.3d at 1309. In *Krug*, we affirmed the Court of Federal Claims' grant of summary judgment in favor of the government because, in his claim, Mr. Krug relied solely upon the language of

Publication 733. He did not point to an agreement with the IRS. Ms. Cambridge likewise has not alleged such an agreement. By contrast, in *Merrick*, Mr. Merrick alleged the government communicated he was entitled to the full reward under Publication 733, but then failed to pay him that sum. The facts of this case [*Cambridge* ] are thus distinguishable from *Merrick*, and most closely parallel the situation in *Krug*. The Court of Federal Claims correctly held that Ms. Cambridge failed to allege facts sufficient to entitle her to relief.

*Cambridge v. United States*, 558 F.3d at 1336 (omission and emphasis in original; footnote omitted); *see also DaCosta v. United States*, 82 Fed.Cl. 549, 557 (2008) (in which the court likewise found that absent negotiations between the person seeking a reward and the IRS, and a specific reward amount set, no contract to make an award came into existence). Like Mr. Krug and Ms. Cambridge in their dealings with the IRS, Mr. Goldings similarly has not alleged an agreement with the USPIS or the FBI to pay a specific sum for information provided. Mr. Goldings' complaint recites his written and oral exchanges by telephone, email and letters with the USPIS and the FBI, but nowhere alleges in his complaint that an agreement for a specific reward amount was struck with the government.

Mr. Goldings does not argue that his complaint alleges the negotiation of a specific reward amount. Instead, plaintiff attempts to distinguish the IRS rewards from the Postal Service rewards. Plaintiff argues that in the IRS reward context, the negotiation and fixing of a specific sum between a claimant and the IRS for the reward are required because, absent such negotiations, there would be no amount identified as a basis for the award. Plaintiff argues, by way of contrast, that the June 2006 Reward Poster 296 contains a list of categories of postal offenses for which specific, stated amounts of rewards are offered, ranging from $10,000.00 to $100,000.00. In addition, according to the plaintiff, the General Provisions in Poster 296 state the terms and conditions for claiming a reward in much greater detail than is included in IRS Publication 733. Therefore, the

plaintiff argues, while negotiation is required for the IRS reward cases, Poster 296 "invites no negotiation." Because, according to the plaintiff, no negotiations were required by Poster 296, plaintiff contends that his complaint is sufficient to withstand a motion to dismiss. Plaintiff's arguments are unconvincing.

The October 2004 version of IRS Publication 733 (Rev. 10–2004), a copy of which plaintiff appended to his response to the defendant's motion to dismiss, and which provided the basis for the plaintiff's argument, states that the IRS reward for information will be a varying percentage (1%, 10% or 15%) of the amount recovered by the IRS, not to exceed $10 million, with the particular percentage depending on the value of the information. The IRS Publication 733 (Rev. 10–2004) further states that: "We will pay claims for reward in proportion to the value of the information you furnished voluntarily and on your own initiative...." The possible IRS rewards, therefore, were indefinite, requiring the negotiation and setting of specific sums as rewards, before a contract could ensue, as indicated by the United States Court of Appeals for the Federal Circuit in *Krug, Merrick* and *Cambridge,* discussed above.

In Mr. Golding's case, both the July 1, 2001 Poster 296 and June 2006 Poster 296 state that the United States Postal Inspection Service "offers a reward of *up to* the amounts shown for information and services leading to the arrest and conviction of any person for the following offenses," followed by potential reward amounts for each specific postal offense of between $10,000.00 and $100,000.00. *See* 39 C.F.R. § 233.2(b) Note (July 1, 2001) (emphasis added). As to the amount of any possible reward, General Provision 2 of both the July 1, 2001 and the June 2006 versions of Poster 296 state that: "The amount of any reward will be based on the significance of services rendered, character of the offender, risks and hazards involved, time spent, and expenses incurred." *See* 39 C.F.R. § 233.2(b) Note (July 1, 2001). Postal Service Poster 296 and IRS Publication 733 both offer rewards for information related to specific criminal violations. Both announce-

ments offer rewards "up to" specific dollar amounts and leave the specific amount of any individual reward up to the discretion of the delegated agency official who has the authority to make awards from 0 dollars, "up to" the authorized, maximum dollar amounts. The words "up to," are significant and allow a range of rewards from the 0 dollars to the maximum stated amount, but do not mandate an award in every instance. Contrary to plaintiffs argument, both the IRS and the USPIS and FBI reward programs are too indefinite for contract formation unless and until specific reward amounts are negotiated and fixed with the appropriate, government officials.

In this regard, the case of *Cornejo–Ortega v. United States,* 61 Fed.Cl. 371, 372 (2004), is instructive. In *Cornejo–Ortega,* the claimant brought suit against the government for payment of $2,200,000.00, allegedly owed claimant under a reward contract with the United States for information leading to the arrest of a top ten, most wanted fugitive. In *Cornejo–Ortega,* the FBI and the Drug Enforcement Administration (DEA) contacted the claimant by sending letters to him regarding the wanted individual. One of the letters noted that "various branches of the United States government are offering rewards in the total amount of $2,200,000 for the location, apprehension, extradition, and conviction" of the fugitive. *Id.* The claimant was provided with a copy of the reward poster "with the type-faced words 'reward up to $2,200,000' above the photograph...." *Id.* One of the letters further advised that, "if the information you provide were to assist the United States government in the location, apprehension, extradition and conviction of [the wanted individual], the Federal Bureau of Investigation is prepared to ensure that you are given appropriate consideration for any reward offered by the FBI and will make other agencies within the United States government offering these rewards aware of your assistance for consideration in the granting of any other rewards." *Id.* Claimant, therefore, alleged that, under the reward agreement he was to receive "up to" $2.2 million, that one of the government letters indicated he would receive "appropriate consideration," and that claimant had participat-

ed in a meeting with DEA and FBI agents who had agreed to pay him $2.2 million for information leading to the apprehension of the fugitive. *Id.* at 373. The fugitive was captured, based in part on claimant's information, and claimant was given a $12,500.00 reward by the FBI, sharing a $50,000.00 reward with three other informants. *Id.* at 372. The court found that none of the FBI agents who met with claimant had the authority to promise him a flat $2.2 million, regardless of what subsequently transpired. *Id.* at 374–75. The court found that no binding reward contract came into being, and entered judgment for the government, stating:

> Finally, the court rejects plaintiff's claim that a binding contract arose when he accepted, by performance, the reward promised by the reward poster he was allegedly handed in prison. Plaintiff essentially argues that because this poster was issued by the United States, *qua* United States, no authority issue arises. Assuming, *arguendo*, this is true, the fact remains that the poster only offered a reward *"up to"* $2.2 million. The quoted phrase has been construed to include zero as its lower limit. Words such as this give rise only to an illusory promise, or more accurately, no promise at all. As stated in the Restatement (Second) on Contracts—
>
>> Words of promise which by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Although such words are often referred to as forming an illusory promise, they do not fall within the present definition of promise. They may not even manifest any intention on the part of the promisor.
>
> *See* Rest. (Second) Contracts § 2, cmt. e. Viewed in light of these principles, the reward poster served, at best, as an invitation to contact the DEA or the FBI and negotiate a reward agreement that would meet the various procedural requirements contained in the Justice Department's manuals.

*Cornejo–Ortega v. United States,* 61 Fed.Cl. at 375 (footnote and other citations omitted; emphasis added).

As indicated in *Cornejo–Ortega,* the Restatement (Second) on Contracts addresses the requisite definiteness, specificity and certainty for contract formation:

> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.
>
> . . .
>
> If the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.

Restatement (Second) of Contracts § 33 (1981).

Like the reward announcement in *Cornejo–Ortega,* the reward announcement in the present case before this court provided for an award of "up to" $2,500,000.00. The reward announcement did not constitute an offer which promised a specific dollar reward. At most, it constituted an invitation for persons such as the plaintiff to contact the USPIS or the FBI in order to negotiate a reward amount. *Id.* Postal Service Reward Poster 296 stated: "The amount of any reward will be based on the significance of services rendered, character of the offender, risks and hazards involved, time spent, and expenses incurred. Amounts of rewards shown above are the maximum amounts which will be paid." 39 C.F.R. § 233.2(b) Note, General Provision 2 (July 1, 2001). Postal Service Reward Poster 296 also stated that the information must be for "the arrest and conviction" of violators. 39 C.F.R. § 233.2(b)(1) (July 1, 2001). Postal Service Reward Poster 296 did not require that a reward be made in every case a possible

reward is announced, or that once useful information was provided, an informant was entitled to a specific reward amount or even any reward. *See* 39 C.F.R. § 233.2(b) Note (July 1, 2001).

Plaintiff Goldings has not alleged that he engaged in negotiations with an individual with sufficient authority to create the implied-in-fact contract he alleges came into existence between the plaintiff and the United States. In fact, no implied-in-fact contract between Mr. Goldings and the United States came into being. The announcements on which plaintiff relies merely offer potential rewards of "up to" various specific amounts, which, without more, created an illusory contract not meeting the requirements of an offer, followed by acceptance. Whether or not to grant a reward to Mr. Goldings, even if he provided information, remained discretionary with the Chief Postal Inspector or his designee, Inspector Cortez. Inspector Cortez exercised his discretion, albeit not in Mr. Goldings' favor, denying Mr. Goldings' claim for reward and plaintiff's subsequent request for reconsideration. Based on the record before the court, that exercise of discretion was not beyond the discretion of Inspector Cortez, and was not arbitrary or capricious. Poster 296 vests broad discretion in Postal Service officials, which should be second guessed only for an abuse of that discretion or lack of a rational basis. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (in a case involving government regulation of advertising content, the Supreme Court stated: "Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153–54, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982))); *Merrick v. United States,* 846 F.2d at 726 (noting the broad discretion in the IRS rewards program to decide whether to make an award or how much to award); *Saracena v. United States,* 206 Ct.Cl. 90, 95, 508 F.2d 1333, 1335 (1975) ("More than a half-century ago this Court declared that 'where Congress has committed to the head

of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involved questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this court should be of opinion that his action was clearly wrong.'" (quoting *United States v. Shimer,* 367 U.S. 374, 381–82, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961) (involving recovery on a Veterans' Administration mortgage guarantee) (quoting *Bates & Guild Co. v. Payne,* 194 U.S. 106, 108–109, 24 S.Ct. 595, 48 L.Ed. 894 (1904) (involving Postmaster General's decision on what constitutes second-class mail)))); *Krug v. United States,* 41 Fed.Cl. at 98 ("An administrative decision as to the amount of a reward under I.R.C. § 7623 [the IRS rewards program] is reviewable by the Court for abuse of discretion or lack of a rational basis.") (citations omitted); *Cal. Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 782 (1986) (in a congressional reference case with a three-judge panel, the case involved a challenge to the government's view of cyclamates as carcinogenic, with the court stating: "Judicial review of discretionary executive actions traditionally has been limited." (citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. at 153, 102 S.Ct. 3014 and *United States v. Shimer,* 367 U.S. at 381, 81 S.Ct. 1554)) (other citations omitted).

*Plaintiff's Unilateral Contract Theory*

In his response to the defendant's motion to dismiss, the plaintiff rejects the description of his case as one only alleging an "implied contract," even though plaintiff used that very description in his complaint. Plaintiff contends that the announcement of a reward is more accurately characterized as an offer for a "unilateral contract," plaintiff's performance of which constitutes acceptance of the offer by the plaintiff. The two concepts are not in conflict. A unilateral contract of the type plaintiff is alleging is a form of an implied-in-fact contract. The basic theory of a "unilateral contract" is recognized in this Circuit, although the theory does not assist plaintiff in this instance. In the context of the present case, the issues raised are whether the USPIS and the FBI intended a unilateral contract, and whether such a con-

tract possessed the requisite definiteness, specificity and certainty. For unilateral contract cases, *see generally First Commerce Corp. v. United States*, 335 F.3d 1373, 1382 n. 5 (Fed.Cir.) ("We note that treating the FHLBB's [Federal Home Loan Bank Board's] forbearance letter [an offer of favorable accounting treatment for supervisory goodwill] as a counteroffer fits the transaction neatly into the mold of a unilateral contract, in which the government promised favorable accounting treatment in exchange for First Commerce's performance of acquiring Mutual Federal."), *reh'g and reh'g en banc denied* (Fed.Cir.2003); *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed.Cir.) (Agency procedures required written approval, such that, "[b]ecause there is no evidence of such prior, written approval by the CO [contracting officer] of the unilateral contract, we hold that the CO lacked the authority to enter into the oral contact and it is therefore not binding upon the government."), *reh'g denied and en banc suggestion declined* (Fed.Cir.1998), *cert. denied*, 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999); *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1018 (Fed.Cir. 1996) ("The Court of Federal Claims correctly ruled that the Conditional Commitment constituted a unilateral contract by which the government agreed to guarantee the loan upon Wells Fargo's performance of the conditions specified, and that Wells Fargo accepted the contract through beginning performance by making the loan.... Here, following the issuance of the Conditional Commitment, in which the Administration 'agree[d] ... [to] execute' the 'Loan Note Guarantee,' Wells Fargo accepted the government's offer by making the $20,000,000 loan to finance construction of the ethanol plant."), *reh'g denied and en banc suggestion declined* (Fed.Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997) (citation omitted); *see also Wells Fargo Bank, N.A. v. United States*, 88 F.3d at 1019 ("That the government's promise to issue the loan guarantee was contingent upon High Plains and Wells Fargo's performance of numerous conditions does not make the promise any less binding. Indeed, the essence of a unilateral contract is that one party's promise is conditional upon the other party's performance of certain acts and when the other party performs, the first party is bound.") (citations omitted).

Plaintiff attempts, unsuccessfully, to muster case authority in support of his theory that the government's reward poster was intended by the Postal Service to be an offer for a unilateral contract, which resulted in a contract binding on the government as a result of Mr. Goldings' performance of providing information to the USPIS and the FBI on the anthrax mailings. Plaintiff's support largely consists of historical cases which are distinguishable from the present case. Plaintiff, for example, cites a United States Court of Claims case, *Drummond v. United States*, 35 Ct.Cl. 356 (1900), now more than one hundred years old, in which a $1,000.00 reward was offered by federal government officials for the apprehension of Henry W. Howgate, who had been indicted for embezzlement and forgery, and who subsequently had escaped custody. *Id.* at 358. At issue in *Drummond* was whether the claimant knew of the reward at the time of the apprehension of Mr. Howgate, and whether the lapse of time of ten years between the reward announcement and the apprehension was controlling, both of which issues were decided in favor of the claimant. *Id.* at 372–73. The Court of Claims recited that the reward could be earned by the "apprehension and delivery" of Mr. Howgate, *id.* at 358, the "arrest and delivery to the United States marshal of this district," *id.*, "the capture of Howgate," *id.*, and by "locat[ing] and arrest[ing]" him. *Id.* at 361. The claimant, the former Chief of the Secret Service Bureau of the Treasury Department, accomplished the tasks. *Id.* at 361, 363. Mr. Drummond arrested Mr. Howgate, brought him before a United States commissioner, swore out a warrant against him before that commissioner, and delivered him to a federal deputy marshal, who in turn delivered Mr. Howgate to the United States Marshal for the District of Columbia. *Id.* at 363. The Court of Claims rendered judgment in favor of Mr. Drummond for the $1,000.00 reward. *Id.* at 374. Although the reward also apparently could have been earned by one who "furnished information leading to his [Mr.

Howgate's] capture," *id.*, the thrust of the reward offer could be characterized as one with definiteness, specificity and certainty—accept the reward offer by capturing and delivering Mr. Howgate, and earn $1,000.00, and that is precisely the way the reward was earned.

In contrast to the situation in *Drummond*, the IRS reward program, the DEA reward program described in *Cornejo–Ortega* and the USPIS and FBI reward program for the anthrax mailings were indefinite and uncertain. As Poster 296 stated at General Provision 2: "The amount of *any reward* will be based on the significance of services rendered, character of the offender, risks and hazards involved, time spent, and expenses incurred." 39 C.F.R. § 233.2(b) Note (July 1, 2001) (emphasis added). Therefore, there was no certainty once a possible reward was announced as to whether a reward would be given. The award amount to any and all who offered information could be zero. Moreover, if a reward was made, the amount was discretionary. Information offered by different sources regarding the anthrax mailings may or may not have been helpful, or somewhere in between. The terms of any possible awards were indefinite and uncertain. If Mr. Goldings had been able to achieve a contract by responding to a general call to citizens for information with the possibility of a reward, then 10,000 tips from concerned citizens across the nation could produce 10,-000 very indefinite "contracts." This lack of specificity is in stark contrast with the *Drummond* case, in which the reward was definite and specific—capture and deliver Mr. Howgate, and receive $1,000.00.

Plaintiff also cites *United States v. Matthews*, 173 U.S. 381, 19 S.Ct. 413, 43 L.Ed. 738 (1899), an even older case than *Drummond*, issued by the United States Supreme Court, which affirmed a United States Court of Claims decision in *Matthews v. United States*, 32 Ct.Cl. 123 (1897). The issue in *Matthews* was whether deputy marshals, whose normal duty was to arrest law breakers, could receive a reward for essentially performing their regular duties. *United States v. Matthews*, 173 U.S. at 382–83, 19 S.Ct. 413. Inasmuch as the reward offer did not exclude law enforcement officials, the Supreme Court affirmed the Court of Claims' judgment in favor of the claimants. *Id.* at 387, 19 S.Ct. 413. The definiteness and certainty identified above in *Drummond* also was present in *Matthews*. In *Matthews*, the government reward offer was $500.00 for the arrest and conviction of Asa McNeil, who was accused of killing "one or more revenue officers." *Id.* at 382, 19 S.Ct. 413. The deputy marshal claimants arrested Mr. McNeil and earned their $500.00 reward. *Id.*

In addition, plaintiff cites a still earlier Supreme Court case, *Shuey v. United States*, 92 U.S. (2 Otto) 73, 23 L.Ed. 697 (1875), involving the apprehension of John H. Surratt, one of John Wilkes Booth's accomplices in the murder of President Lincoln. A reward of $25,000.00 was offered for the apprehension of Mr. Surratt. Before the court was the revocation of the reward, a fact which was not known by the reward claimant. *Id.* at 76–77. Nevertheless, in spite of the revocation, the claimant was given $10,000.00. "His receipt of the $10,000 was in full of all *equitable claim: legally, he had none.*" *Id.* at 75 (citations omitted; emphasis added). Claimant then sought the difference between the full $25,000.00 reward, and the $10,000.00 which he had received in equity. Because the claimant had not arrested Mr. Surratt, and because the reward had been revoked, the claimant did not obtain a judgment for the difference. *Id.* at 76–77. The specific reward amount for apprehension originally offered was definite: the apprehension of Mr. Surratt for $25,000.00. Because of the revocation, the amount received in equity was not the result of a legally binding, unilateral contract.[6]

---

6. This court has no authority to make a monetary award in equity to Mr. Goldings, not based on legal merit, such as the $10,000.00 award in the 1875 *Shuey* case. The Court of Federal Claims has jurisdiction to award damages based on breach of a legal duty. Claims in the Court of Federal Claims must be "founded upon a money-mandating source...." *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed.Cir.2008). Although Congress has provided the Court of Federal Claims with certain equitable powers in specific kinds of litigation, the court does not possess general equitable powers. *See Bowen v. Massachusetts*, 487 U.S. 879, 905 & n. 40, 108

Plaintiff also cites *Simmons v. United States*, 308 F.2d 160, 161–62 (4th Cir.1962), a non-precedential case for this court, in which a private company, American Brewery, Inc., gave a $25,000.00 fishing prize to plaintiff for catching a particular rock fish (Diamond Jim III), released into the Chesapeake Bay by American Brewery employees. The issue in the *Simmons* case was whether plaintiff must pay taxes on the prize, and the court's decision was in the affirmative. *Id.* at 168. The brewery no doubt intended its unilateral offer of a prize to be accepted by a fisherman like Mr. Simmons, who ultimately caught Diamond Jim III and was awarded the taxable $25,000.00. *Id.* at 164–65. The *Simmons* case has the definiteness, specificity and certainty found in the 19th century United States Court of Claims and United States Supreme Court cases addressed above, catch Diamond Jim III and receive $25,000.00. The USPIS and the FBI, however, are not private entities and, unlike American Brewery, Inc., defendant argues that these public entities did not contemplate the formation of a contract or have mutual intent to form a contract when these agencies broadly issued an announcement to the public asking for information, with the possibility of a reward.

Regarding the requisite definiteness, specificity and certainty, *Cornejo–Ortega*, quoted above, stated: "the poster only offered a reward 'up to' $2.2 million. The quoted phrase has been construed to include zero as its lower limit. Words such as this give rise only to an illusory promise, or more accurately, no promise at all." *Cornejo–Ortega v. United States*, 61 Fed.Cl. at 375 (citations omitted). The characterization of the reward poster in *Cornejo–Ortega* serving, at best, as an invitation to negotiate a certain reward is reminiscent of the IRS reward cases discussed earlier. *See Cambridge v. United States*, 558 F.3d at 1336 ("Significantly, in *Krug*, we stated that Publication 733 does not in itself create a contract. Rather, 'in Publication 733 ... the Government *invites* offers

for a reward; the informant *makes* an offer by his conduct; and the Government *accepts* the offer by agreeing to pay a specific sum.' *Krug* [*v. United States*], 168 F.3d at 1309.") (omission and emphasis in original).

■ The court finds that the reward Poster 296 in the present case did not constitute an offer for a unilateral contract. At most, it constituted an invitation for persons such as the plaintiff to contact the USPIS or the FBI in order to negotiate a reward amount. Poster 296 states: "The amount of any reward will be based on the significance of services rendered, character of the offender, risks and hazards involved, time spent, and expenses incurred. Amounts of rewards shown above are the maximum amounts which will be paid." 39 C.F.R. § 233.2(b) Note, General Provision 2 (July 1, 2001). Poster 296 does not require that a reward be made in every case a reward is announced, or that once information is provided, an informant is entitled to a specific reward or any reward.

In sum, plaintiff has not alleged in his complaint that he engaged in negotiations with a USPIS or FBI official with authority to create the implied-in-fact contract he alleges was created between the plaintiff and the United States, and plaintiff alleges was subsequently breached by the United States. Poster 296 (both the July 1, 2001 and the June 2006 versions), on which plaintiff states he relied, merely offers rewards of "up to" various amounts, which absent further negotiation, creates an illusory or indefinite contract, not meeting the requirements of an offer followed by acceptance. Absent a negotiated, binding contract, whether or not to grant a reward to Mr. Goldings, even if he provided information, remained completely discretionary with the Chief Postal Inspector or his delegate, Inspector Cortez. Inspector Cortez did not abuse his discretion when he denied Mr. Goldings' claim for reward and

S.Ct. 2722, 101 L.Ed.2d 749 (1988); *Richardson v. Morris*, 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973); *Brown v. United States*, 105 F.3d 621, 624 (Fed.Cir.), *reh'g denied* (Fed.Cir. 1997); *see also Eastern Shawnee Tribe of Oklahoma v. United States*, 582 F.3d 1306, 1308 (Fed. Cir.2009) (suits for money damages in the Court

of Federal Claims seek compensation for breach of "legal duty." (quoting *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002))), *reh'g denied*, 598 F.3d 1326 (Fed.Cir.2010), *judgment vacated on other grounds*, —— U.S. ——, 131 S.Ct. 2872, 179 L.Ed.2d 1184, 2011 WL 1631039 (2011).

when he denied plaintiff's subsequent request for reconsideration. The court concludes that the complaint fails to state a claim upon which relief can be granted.

*Failure to Comply with Provisions of Poster 296*

■ Even if, as plaintiff alleges, a contract between the parties came into existence, under the terms of Postal Service Poster 296, plaintiff's complaint still fails to state a claim upon which relief can be granted. Given the facts pled in the complaint, the terms of any such alleged contract were not fulfilled. As discussed above, the reward announcements issued by the USPIS and the FBI stated that rewards may be given in exchange for information "leading to the arrest and conviction" of those responsible for the anthrax mailings, and no arrest and conviction occurred. The announcements further provided that, "[r]eward payment will be made in accordance with the conditions of Postal Service Reward Notice 296, dated February 2000." According to plaintiff, when he was unable to obtain a copy of the cited February 2000 Poster 296, he went online, found a June 2006 version of Poster 296, and included that version in his complaint.

Both the February 2000 and the June 2006 versions of Poster 296 differ from the version of Poster 296 published as a Note in the Postal Service's CFRs at 39 C.F.R. § 233.2(b). As discussed above, the Program Manager for the Postal Inspection Service, Ms. Carroll, explained that when Poster 296 was sent out for posting to the public, she, "[f]or the most part, copied verbatim what was contained in the CFRs, but did make some changes on occasion." For example, she added a General Provision 5 to Poster 296, stating that "Postal Service employees are not eligible to receive rewards." This provision was not contained in the February 2000 Poster 296, but was added to General Provision 4 in the July 1, 2004 CFR, and thereafter included in the current CFR. Ms. Carroll also altered General Provision 1 in the June 2006 Poster 296, which language is found in the Poster 296 on the USPIS' online site, but is not found in the version of Poster

296 in any of the CFRs. Ms. Carroll stated in her declaration:

> However, for stylistic reasons, I deviated slightly from the version in 39 C.F.R. § 233.2. when I was copying *General Provision* number 1. I felt that it sounded better and was more grammatically clear to write "The written claim for reward payment must be submitted within six months from ... the date of the offender's death, if the offender was killed while committing a crime or resisting lawful arrest for one of the above offenses" [language from the June 2004 and June 2006 Poster 296] rather than "The written claim for reward payment must be submitted within six months from ... the date of the offender's death, if killed in committing a crime or resisting lawful arrest for one of the above offenses." [language from the Poster 296 in the CFRs] In making this minor change, I did not intend to alter in any way the terms set forth in 39 C.F.R. § 233.2. (omissions in original; brackets added).

The official version of General Provision 1, Poster 296, contained in the CFRs, which Ms. Carroll altered for clarity in the June 2006 Poster 296, states:

> The Postal Inspection Service investigates the above described crimes. Information concerning the violations, requests for applications for rewards, and written claims for rewards should be furnished to the nearest Postal Inspector. The written claim for reward payment must be submitted within six months from the date of conviction of the offender, or the date of formally deferred prosecution or the date of the offender's death, if killed in committing a crime or resisting lawful arrest for one of the above offenses.

Poster 296, 39 C.F.R. § 233.2(b) Note (July 1, 1999–July 1, 2010).

General Provision 1 of the February 2000 Poster 296, cited in the reward announcements for the anthrax mailings, stated: "The Postal Inspection Service investigates the above describes [sic] crimes. Information concerning the violations, requests for applications for rewards, and written claims for rewards should be furnished to the nearest Postal Inspector." At the very same time

this February 2000, truncated version of Poster 296, General Provision 1 was cited in the USPIS and FBI reward announcements, the more expansive General Provision 1 from the CFRs, quoted above, also was in existence. *See* 39 C.F.R. § 233.2(b) Note (July 1, 1999 and July 1, 2000) Ms. Carroll's declaration indicates that, in making minor changes to Poster 296, she "did not intend to alter in any way the terms set forth in 39 C.F.R. § 233.2." The February 2000 truncated version of Poster 296, therefore, provided some notice of the Postal Service's rewards program, but was not the official, final word on the rules associated with the rewards program. The official version of Poster 296 was the one published in the CFRs. As noted above, Ms. Carroll further stated in her declaration that her slight alteration in General Provision 1 was for "stylistic" reasons, that her alteration "sounded better," and "was more grammatically clear . . . ." Her efforts, she indicated, were not intended as substantive changes in meaning, but an explanation or clarification of what was already in Poster 296.

The defendant notes that the information provided by the plaintiff never led to an arrest or conviction, and the plaintiff has conceded this point. The Postal Service regulations state that rewards are paid for the "arrest and conviction" of offenders. *See* 39 C.F.R. § 233.2(b)(1) (July 1, 2001) ("Rewards will be paid in the amounts and under the conditions stated in Poster 296, *Notice of Reward,* for the arrest and conviction of persons for the following postal offenses . . . ."); the preamble of Poster 296 ("The United States Postal Service offers a reward up to the amounts shown for information and services leading to the arrest and conviction of any person for the following offenses . . . .") and General Provision 1 of Poster 296, 39 C.F.R. § 233.2(b) Note (July 1, 2001) ("The written claim for reward payment must be submitted within six months from the date of conviction of the offender or the date of formally deferred prosecution or the date of the offender's death, if killed in committing a crime or resisting lawful arrest for one of the above offenses."). The plaintiff argues, however, that he is entitled to a reward because the government's primary suspect, Dr. Ivins,

was "killed while committing a crime" (using the language from the June 2006 Poster 296, not from the above July 1, 2001 CFR version), namely, that Dr. Ivins killed himself and, thereby, committed the "crime of suicide." Plaintiff argues that suicide remains a common law misdemeanor in some states, including Maryland where Dr. Ivins died. Thus, plaintiff concludes, although incorrectly, that his interpretation is "a correct literal meaning" of the "unambiguous wording" in the June 2006 Postal Service Poster 296, General Provision 1.

Poster 296 offers a reward for information "leading to the arrest and conviction of any person" for the postal offenses listed in the Reward Poster, which includes the offense of mailing poison or hazardous materials. 39 C.F.R. § 233.2(b)(1)(ii) (July 1, 2001). Poster 296 further provides that claims must be submitted within six months of the date of conviction. In this case, there was no arrest or conviction stemming from the information which plaintiff provided in the anthrax mailings case. In the case of an alleged offender who dies before arrest or conviction, Poster 296 provides that claims must be submitted within six months of the date of the offender's death, if the offender was killed while committing a postal offense or was killed while resisting arrest for a postal offense.

In the case now before the court, the alleged offender, Dr. Ivins, killed himself before indictment, arrest or conviction. Dr. Ivins was not killed while committing a postal offense, and he was not killed while resisting arrest for a postal offense. The language of the Poster 296 (in the CFRs) exception into which plaintiff attempts to fit his case, is the claim for reward must be submitted within six months of the offender's death, "if killed in committing a crime or resisting lawful arrest for one of the above offenses." The "above offenses" listed are all postal offenses. Suicide is not listed in Postal Service Poster 296 as a postal offense. Examples of postal offenses are: the assault or murder of Postal Service employees who are on official duty, theft of mail or Postal Service money, robbery of a mail custodian, burglary of a Post Office, or the mailing of bombs, explosives, poisons, controlled dan-

gerous substances, or hazardous materials. *See* 39 C.F.R. § 233.2(b) Note (July 1, 2001).

The clear context of the words, "killed in committing a crime or resisting lawful arrest for one of the above offenses," means killed while committing a listed postal offense or resisting arrest for commission of a listed postal offense. Ms. Carroll, Program Manager for the Postal Inspection Service, in her January 11, 2011 sworn declaration, drafted the following explanatory words for the June 2006 Poster 296: one must file a claim within six months from the date of the offender's death, "if the offender was killed while committing a crime or resisting lawful arrest for one of the above offenses." In contrast, plaintiff's interpretation attempts to strip the words in Poster 296 of their context. *See Gen. Elec. Co. v. United States,* 92 Fed.Cl. 798, 812 (2010) ("The court cannot construe a regulation to render the provision meaningless.... Nor can it [the court] construe a regulation without regard to its context." (citing *Griffin v. Sec'y of Veterans Affairs,* 288 F.3d 1309, 1331 (Fed.Cir.) ("Challenged terms must be read in context of the regulation as a whole."), *cert. denied,* 537 U.S. 947, 123 S.Ct. 410, 154 L.Ed.2d 290 (2002))) (other citations omitted); *see also Envtl. Def. v. Duke Energy Corp.,* 549 U.S. 561, 575–76, 127 S.Ct. 1423, 167 L.Ed.2d 295 (2007) (stating that "[c]ontext counts" in addressing statutory construction); *Colorado Dep't of Labor and Emp't v. U.S. Dep't of Labor,* 875 F.2d 791, 797 (10th Cir.1989) ("In determining whether an agency's interpretation is plainly erroneous or inconsistent with the regulation, we follow the principle of regulatory construction that although 'regulatory terms not given a specific regulatory definition are to be interpreted according to their commonly understood definitions,' nonetheless a court ' "cannot concentrate on individual terms and ignore a consideration of the *context* in which the term appears." ' " (quoting *Shepherd Oil, Inc. v. Atl. Richfield Co.,* 734 F.2d 23, 29–30 (Em.App.1984) (quoting *Citronelle–Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 719 (Em.App.), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982)))) (emphasis added); *Farmers Tel. Co. v. FCC,* 184 F.3d 1241, 1248 n. 4 (10th Cir.1999) (citing *Colorado Dep't of*

*Labor and Emp't v. U.S. Dep't of Labor,* 875 F.2d at 797).

The United States Court of Appeals for the Federal Circuit has stated that the Postal Service is empowered by Congress "to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title...." 39 U.S.C. § 401(2) (2006). This authority includes the power to make rules and regulations to support the specific power to "offer and pay rewards for information and services in connection with violation of the postal laws...." 39 U.S.C. § 404(a)(8) (2000). Moreover, "[a]s a general rule, we must defer to an agency's interpretations of the regulations it promulgates, as long as the regulation is ambiguous and the agency's interpretation is neither plainly erroneous nor inconsistent with the regulation." *Am. Signature, Inc. v. United States,* 598 F.3d 816, 827 (Fed.Cir.) (quoting *Gose v. U.S. Postal Serv.,* 451 F.3d 831, 836 (Fed.Cir.), *reh'g denied* (Fed.Cir.2006) (citing *Gonzales v. Oregon,* 546 U.S. 243, 255, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006))), *reh'g and reh'g en banc denied* (Fed.Cir.2010) (other citations omitted). Although, "[w]here the agency's interpretation [of its regulations] seeks to advance its litigating position, deference is typically not afforded to the agency's position announced in a brief." *Am. Signature, Inc. v. United States,* 598 F.3d at 827 (citing *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)).

The words of Poster 296 (in the CFRs), "if killed in committing a crime or resisting lawful arrest for one of the above [postal] offenses," means killed, not by one's own hand, but by a third party while committing a postal offense. Buttressing this plain meaning interpretation is the June 2006 Poster 296, attached by plaintiff to his complaint, which states the exception to a conviction or formally deferred prosecution in slightly different, but consistent, words. The June 2006 version of Poster 296 was issued before Mr. Goldings filed his complaint, for purposes of clarification, and not as an aid in pending litigation. A claim for reward payment must be submitted within six months of "the date

of the offender's death, if the offender *was killed* while committing a crime or resisting lawful arrest for one of the *above offenses.*" (emphasis added). The words, "was killed," in plain usage indicate that the exception would apply if the offender "was killed" by a third party, not by the alleged violator by his own hand, while committing one of the "above offenses," a postal crime, not suicide. In plain usage, a person who commits suicide was not killed by a third party, and in committing suicide was not committing a "postal offense." Ms. Carroll was attempting to explain and clarify the language of General Provision 1, and did so in a way consistent with the original language of Poster 296 (in the CFRs). The Postal Service's interpretation of its own rules and regulations is reasonable.

In addition, plaintiff attached a March 24, 2009 letter to his complaint which Mr. Goldings sent to USPIS Inspector Cortez. Plaintiffs letter states, in part: "Dr. Bruce Ivins died on July 29, 2008. The several public statements of the Federal Bureau of Investigation made since his death include facts from which it must be concluded that Dr. Ivins was killed by his own hand under circumstances tantamount to resisting lawful arrest for the crime at least of 'mailing poison.'"

In support, plaintiff also enclosed with his complaint the first page of the United States Department of Justice's February 10, 2010, Amerithrax Investigative Summary, which includes the following:

> By the summer of 2008, the United States Attorney's Office for the District of Columbia was preparing to seek authorization to ask a federal grand jury to return an indictment charging Dr. Ivins with Use of a Weapon of Mass Destruction, in violation of Title 18, United States Code, Section 2332a, and related charges. However, before that process was completed, he committed suicide. Aware of the FBI investigation and the prospect of being indicted, Dr. Ivins took an overdose of over-the-counter medications on or about July 26, 2008, and died on July 29, 2008. Administrative and investigative steps taken in the past year toward closure of the investiga-

tion confirm the conclusion that Dr. Ivins perpetrated the anthrax letter attacks.

This excerpt from the Amerithrax Investigative Summary demonstrates that government evidence pointed to Dr. Ivins, that the United States Attorney's Office was "preparing to seek authorization to ask a federal grand jury to return an indictment" against Dr. Ivins, that the government thought that Dr. Ivins was aware of the prospect of being indicted, and that Dr. Ivins committed suicide. Contrary to plaintiff's argument, the Amerithrax Investigative Summary does not demonstrate that Dr. Ivins was killed while resisting arrest. This last point is reiterated in Inspector Cortez's June 30, 2009 letter to plaintiff, which plaintiff also attached as an exhibit to his complaint. Inspector Cortez's letter states, in part:

> First, we do not agree with nor find any foundation to support your conclusion that the death of Dr. Ivins in this matter is in any manner tantamount to resisting arrest, and therefore triggering the provision cited above [in Poster 296, General Provision 1, 39 C.F.R. § 233.2(b) Note (killed "resisting lawful arrest") ].
>
> Further, we did confer with the FBI, and a review of statements issued by them has not disclosed any statements which concluded or inferred Dr. Ivins was killed by his own hand under circumstances tantamount to resisting lawful arrest.
>
> At the time of his death, the Amerithrax investigation was focused on Dr. Ivins, but it is inaccurate to assume his arrest was imminent. . . .

The record reflects that, although the Amerithrax investigation may have been focused on Dr. Ivins, at the time of his death Dr. Ivins was not in the process of being arrested and, therefore, could not "resist arrest." In sum, Dr. Ivins was not killed "resisting lawful arrest" for a postal offense. Plaintiff has attempted to pluck words out of Poster 296, as though there were no other words in Poster 296, and offers a strained, out of context interpretation of the words, rather than a plain meaning interpretation, in context. Plaintiffs "crime of suicide" is not a listed postal offense, and is not in compliance with the language of the Reward Poster ex-

ception. The exception in the Reward Poster contemplates an offender being killed, not by his own hand, but by a third party, while the offender is committing a postal offense or resisting arrest for a postal offense.

On April 14, 2011, plaintiff filed a motion for leave to supplement the record. Plaintiff states that the occasion for his motion was the release "on or about March 24, 2011," of the "The Amerithrax Case: Report of the Expert Behavioral Analysis Panel" by a panel composed largely of psychiatrists and other experts, who examined the mental health records of Dr. Ivins, and lessons learned to prevent future bioterrorism attacks. According to the Panel Report, the Department of Justice had asked a Judge of the United States District Court for the District of Columbia, for authority to review Dr. Ivins' psychiatric records, which had been placed under seal. The Judge issued the Order to release the records.

Plaintiff highlights portions of the redacted Report, which is publicly available, and brings selected excerpts from the Report to the court's attention: On July 9, 2008, Dr. Ivins attended his regular group therapy session. He was "agitated," and told the therapy session that "[h]e had a hit list of co-workers that he would murder." According to the Report, group therapy members interviewed by the FBI stated that, in their own words, Dr. Ivins "thought he would be executed or go out in a 'blaze of glory' and be killed by police." The Report concluded that: "As the scrutiny of investigators ratcheted up and at last, the Federal Government prepared to indict him for the mailings, Dr. Ivins finally revealed his rage in a remarkable rant. At a group therapy session in July 2008, he bragged that he was procuring a gun and threatened to kill others and then be killed by police." According to the Report, as a result of concerns stemming from his conduct at the July 9, 2008 therapy session, on July 10, 2008, Dr. Ivins was involuntarily committed to a psychiatric hospital. He was discharged from the psychiatric hospital on July 24, 2008. Immediately after his discharge, he purchased various over the counter drugs as well as prescription drugs. The Report stated that he likely overdosed on the drugs on July 26, 2008. Paramedics responded to Dr. Ivins' home on July 27, 2008, and found him unresponsive. Dr. Ivins died on July 29, 2008. The conclusion stated in the Report was that Dr. Ivins committed suicide, by "an intentional overdose of multiple medications. . . ." The supplemental material in the Report is consistent with the Department of Justice's February 10, 2010, Amerithrax Investigative Summary, which stated, in part: "Aware of the FBI investigation and the prospect of being indicted, Dr. Ivins took an overdose of over-the-counter medications on or about July 26, 2008, and died on July 29, 2008."

Plaintiff attempts to use this supplemental material in the Report to buttress his argument, previously made, that the death of Dr. Ivins, was "tantamount to resisting lawful arrest." Plaintiff's reasoning is that in accordance with the language of Poster 296, because Dr. Ivins "killed himself in order to resist his lawful arrest for a capital crime," plaintiff should receive an award because his claim was submitted within six months from the offender's death, "if killed in committing a crime or resisting lawful arrest for one of the above offenses." Poster 296, 39 C.F.R. § 233.2(b) Note (July 1, 1999–July 1, 2010). The court remains unconvinced by plaintiff's argument. Dr. Ivins was not arrested, nor were law enforcement authorities in the process of attempting to arrest him when he died, so it was not possible that Dr. Ivins was killed while "resisting lawful arrest for one of the above [postal] offenses." *Id.* According to the Report, his fellow group therapy members reported that Dr. Ivins "bragged" to the group that he was going to get a gun, and was going to kill others, "and then be killed by police." Killing postal workers is a listed postal crime, killing co-workers, which was the focus of his group therapy "rant," is a crime, but is not a listed postal offense. In any event, Dr. Ivins' reported plan or fantasy of being killed by police after attempting to kill co-workers did not happen. Dr. Ivins was not killed by the police while resisting arrest for a postal offense or for any crime.

Plaintiff also argues that Dr. Ivins "probably violated federal and state laws relating to possession and use of controlled substances."

However, the supplemental Report provided by plaintiff to the court states to the contrary. Regardless, overdosing on illegal drugs is not a postal offense, such that plaintiff is unable to fit within the parameters of Poster 296. Poster 296, General Provision 1, 39 C.F.R. § 233.2(b) Note (July 1, 1999–July 1, 2010).

Finally, plaintiff argues that Dr. Ivins' course of conduct satisfies the crime of "stalking" under Maryland state law, citing *Hackley v. State*, 161 Md.App. 1, 866 A.2d 906 (2005). In *Hackley*, the stalker, the victim's former boyfriend, among other things left threatening letters on the victim's car windshield on three occasions. Mr. Hackley argued that he did not leave the letters on the windshield in his former girlfriend's presence, and, therefore, this conduct should not be considered stalking. *Id.* at 912. The Maryland state court disagreed, and upheld his conviction for stalking. *Id.* at 917–18. Plaintiff does not further elaborate on the relationship of the Maryland case to the present case, which is hard to discern. In any event, stalking, like suicide, is not a listed postal offense in Poster 296. Poster 296, 39 C.F.R. § 233.2(b) Note (July 1, 1999–July 1, 2010).

## CONCLUSION

For the foregoing reasons, plaintiff's complaint in this court is dismissed for failure to state a claim upon which relief can be granted. The defendant's motion to dismiss pursuant to RCFC 12(b)(6) is **GRANTED,** and the plaintiff's complaint is **DISMISSED.** The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion. Despite the Executive Branch's exercise of its discretionary authority and the decision of this court not to overturn that decision, Mr. Goldings is to be commended for coming forward as a citizen, on his own time and at his own expense, and attempting to assist the USPIS and the FBI during the investigation of this horrific crime, which gripped the nation. No costs.

**IT IS SO ORDERED.**